**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:04cr381** |
| | ) | |
| **ALIRIO REYES AND** | ) | |
| **OSMIN HERIBERTO** | ) | |
| **ALFARO-FUENTES,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

In this multi-count indictment against two defendants alleging, *inter alia*, (i) conspiracy to commit murder in aid of racketeering, (ii) murder in aid of racketeering, (iii) attempted murder in aid of racketeering, and (iv) use of a firearm during crimes of violence, the government seeks admission of two redacted statements of one defendant, Osmin Heriberto Alfaro-Fuentes ("Alfaro"), at the joint trial of Alfaro and his co-defendant, Alirio Reyes (a.k.a. "Seco"). The statements, redacted to substitute the neutral pronoun "individual" for Reyes' name, implicate Alfaro and an unnamed "individual" in a shooting that took place in Herndon, Virginia, on May 16, 2004. Reyes argues that because the statements, even in redacted form, remain facially incriminatory with respect to him, the Sixth Amendment requires (i) severance of Reyes' and Alfaro's trials; (ii) further redaction of Alfaro's statements to remove any reference to a person other than Alfaro; or (iii) exclusion of Alfaro's statement altogether. At issue, therefore, is whether Alfaro's statements to authorities that inculpate both him and Reyes can be appropriately redacted so as not to infringe Reyes' rights under the Confrontation Clause of the Sixth

Amendment.

## I.

On May 16, 2004, a male and female juvenile were shot in Herndon, Virginia.  The male was killed and the female was severely wounded.  Arrest warrants were issued for defendants in connection with the shootings, but they had fled the jurisdiction.  A month later, Alfaro and Reyes were arrested in a motel room in Los Angeles, California, where they were registered under fictitious names.

On June 21, 2004, Detectives Lee Duranko, Claudio Saa, and James Moore of the Herndon, Virginia, Police Department traveled to Los Angeles to continue their investigation into the May 16 shootings.  On that day, the detectives interviewed Alfaro in a holding facility in Los Angeles.  Prior to commencement of the interview, Alfaro was given his *Miranda* rights in English and Spanish, which he waived, and then agreed to be interviewed.[1]  In the course of being interviewed by Detective Duranko, Alfaro acknowledged that he had been in the area where the shootings occurred on May 16, and also provided information about Reyes' whereabouts on that day.  Detective Duranko took notes while Alfaro was speaking, and then repeated to Alfaro what he understood Alfaro had said.  Detective Duranko then asked Alfaro to initial next to each statement Detective Duranko had read aloud if Alfaro agreed the statement accurately reflected what Alfaro had said.  Alfaro complied, initialing next to each statement to indicate his agreement.

---

[1] Following an evidentiary hearing, Alfaro's waiver of his *Miranda* rights and signing of the waiver form were found to be knowing and voluntary.  *See United States v. Reyes*, Case No. 1:04cr381 (E.D. Va. July 22, 2005) (Order).

Alfaro's June 21 statement, which is reproduced in full below,[2] focuses on Alfaro's activities on the day of the shooting and includes three references to Reyes.  In essence, Alfaro stated that he and Reyes, seeking food, went to a friend's house near the location of the shooting.  According to Alfaro, his friend drank a beer but refused to give him one.  Alfaro also stated that he left the friend's place for home, but did not know when Reyes left.  Alfaro further noted that he saw the victims walking down the street near the friend's home, but stated that "he did not shoot them."

On July 2, 2004, at the Los Angeles Airport, Detective Duranko assumed custody of Alfaro from the United States Marshals for the purpose of returning Alfaro to Virginia.  While waiting for their flight, Detective Duranko told Alfaro that Reyes was talking and blaming Alfaro for the shootings, which was not true, and that Detective Duranko wanted to hear Alfaro's side of

---

[2] The full text of Alfaro's June 21 statement follows with each reference to Reyes bolded, and the neutral pronoun to be substituted in place of each such reference is bolded and in brackets.

Alfaro stated that it was still daylight when he and *Seco* [*another individual*] went over to "Negro's" to ask for some food.  Once they arrived, Negro came out of the house first and he was followed about a minute later by his girlfriend Melissa.  All four then sat outside in the grass in front of the residence.  Alfaro stated Negro was drinking a beer and he asked Negro for one. Negro refused and Alfaro did not know why.  Negro told Alfaro, "you're [sic] not going to drink."  Alfaro asked for something to eat and Melissa brought him a sandwich, but he was still hungry.  He then asked her to make him some tortillas and she agreed.  According to Alfaro, Melissa went inside and never came back.  Alfaro stated that he then left Negro's residence to go home.  He stated that it was "a little dark outside."  He stated that he went up Cavalier Drive to Park Avenue.  He then made a left onto Park Avenue to go to the bike trail.  Alfaro stated that he left Negro's residence first and he did not know when *Seco* [*any other individual*] left.  He also stated that he did not know if *Seco* [*the other individual*] was drinking.  Alfaro stated that it was a little more than a month ago on Sunday that this occurred.  Alfaro recalled it being on a Sunday, because he did not work that day.  He stated that he was supposed to work, but his boss did not show up.  Alfaro recalled seeing bicycles in Negro's yard.  However, he stated none of them were his.  He further stated, "I don't ride a bike."  Alfaro stated that he saw a boy and possibly a girl walking down Cavalier Drive close to Negro's residence.  They (the boy and the girl) then went walking towards Park Avenue.  Alfaro stated this was right before he left Negro's residence.  He then followed up with "but I did not shoot them."

the story.  Alfaro refused to say anything at that time, but stated he would consider telling

Detective Duranko what happened once they returned to Virginia.[3]  After arriving in Virginia,

Alfaro was escorted to an interview room at the Herndon Police Department, where he was

provided food and drink and again given his *Miranda* rights.  After again knowingly and

voluntarily waiving his rights, Detective Duranko reinterviewed Alfaro.[4]

During this interview, Alfaro gave a detailed summary of the events of May 16.  Alfaro's

July 2 statement, reproduced in full below,[5] refers to Reyes fifteen times, and details Alfaro and

---

[3]  The record indicates that during the flight Alfaro was fed, allowed to use the bathroom several times, and was given a headset to listen to music and to watch a movie.

[4] *See supra* note 1.

[5]  The full text of Alfaro's July 2 statement follows with each reference to Reyes bolded, and the neutral pronoun to be substituted in place of each such reference is bolded and in brackets.

Alfaro stated that on the day of the incident he and **Reyes [*another individual*]** were at the soccer field located on Alabama Drive, watching a soccer game.  This was around 2:00 or 3:00 P.M. Alfaro stated that he left the soccer field around 5:00 P.M.  According to Alfaro, **Reyes [*the other individual*]** left the soccer game before him.  Alfaro stated that when he left the soccer field he met back up with **Reyes [*this individual*]** near the Dulles Park Apartments.  Alfaro stated that **Reyes [*the other individual*]** was already on a bicycle and that he (Alfaro) stole a bicycle from the apartment complex.  Alfaro described the bicycle as a girl's mountain bicycle.  He further stated that **Reyes [*the other individual*]** was on a "big mountain bike."  Alfaro could not recall the color of the bicycles.  After hanging around the apartment complex for about 20 minutes they left the area.  Alfaro and **Reyes [*this individual*]** then rode over to Negro's residence.  Alfaro could not remember what time it was when they arrived, but stated that it was almost dark outside.  Alfaro stated that they went to Negro's house because they were hungry.  Once at the residence they ate food outside in front of the residence.  Alfaro said that he had a sandwich and Negro gave him a soda.  While outside, Alfaro stated that all of them were just talking. According to Alfaro, they stayed at Negro's for approximately 20 minutes.  However, he was not sure of the time frame and stated that he was only guessing how long they stayed there.  He stated that he and **Reyes [*another individual*]** left Negro's residence when they saw the boy and girl walking on Cavalier Drive.

Alfaro stated that the boy and girl went straight across on Park Avenue.  Alfaro stated he

Reyes' activities prior to the shootings.  Most importantly here, this statement also describes the shootings themselves.  In this regard, Alfaro stated that he and Reyes confronted the victims, and that after Reyes confirmed that the male was a member of a rival gang, Reyes shot both victims.

Although Alfaro's motion to suppress the statements at issue was denied, left open was the question whether Alfaro's statements could be effectively redacted,[6] or whether either

----

followed them turning left onto Park Avenue and then circled back towards the boy and girl. According to Alfaro, **Reyes** [***this individual***] went right on Park Avenue and then circled back towards the boy and girl.  According to Alfaro, **Reyes** [***this individual***] went right on Park Avenue, staying on the right side of the roadway.  Alfaro stated that when he stopped the boy and girl they were standing on the roadway and he was stopped directly in front of them.  This occurred on the left side of Park Avenue, staying on the right side of the roadway.  Alfaro stated that when he stopped the boy and girl they were standing on the roadway and he was stopped directly in front of them.  **Reyes** [***This individual***] approached and was standing approximately 2 feet away in front of Alfaro, closer to Ferndale Avenue, off to his right.  According to Alfaro, the boy and girl were facing the town homes.  He further stated that he was still straddling his bicycle, which was facing toward Ferndale Avenue.  Alfaro stated that he had to turn his head to talk to the victims.  Alfaro asked the boy and girl "what's up?"  He then asked them if they were from the 18th Street Gang.  Alfaro said when the boy said "yes," he just heard shots being fired. He was looking at the boy and girl when the shots were fired.  Alfaro stated that he did not know that "**Reyes** [***this individual***] had the gun that day."  Alfaro stated that **Reyes** [***this individual***] had to shoot them "because there were only the four of us there."  Alfaro stated that he had seen **Reyes** [***this individual***] with the gun approximately 3 months ago at his residence.  He described the gun as holding six bullets and being black in color including the grip.  Alfaro stated that he knew this because **Reyes** [***this individual***] was showing him the gun.  Alfaro did not know the name or caliber of the gun, but stated that the bullets were about an inch in length.

On the night of the incident, Alfaro stated that he was wearing a "white wife beater T-shirt" and a white hat.  When asked what type of hat, he was unable to describe it by name.  However, he did state that the top of his head was not covered.  When asked where his visor was now, Alfaro stated that he lost it running away from the scene.  Alfaro stated that he was wearing khaki colored pants.

Alfaro stated that when they left the scene, he went left on Ferndale Avenue and **Reyes** [***the other individual***] went right on Ferndale Avenue.

[6] The government correctly concedes that the admission of Alfaro's statements in unredacted form would violate Reyes' Sixth Amendment rights.  *See* "Response of United States to Defendant's Memorandum as to Admission of Codefendant's Statements."

severance or exclusion were required instead.  This Memorandum Opinion addresses that issue.

## II.

The general rule, especially in conspiracy cases, is that defendants indicted together, as here, should be tried together.  *See United States v. Najjar*, 300 F.3d 466, 473 (4th Cir. 2002) (stating that the Supreme Court has indicated that "there is a preference in the federal system for joint trials of defendants who are indicted together" (citing *Zafiro v. United States*, 506 U.S. 534 (1993)).  Yet, there may be circumstances in which trying co-conspirators together results in prejudice to a defendant, and in such circumstances, Rule 14, Fed. R. Crim. P., empowers trial courts to order severance.  *See* Rule 14, Fed. R. Crim. P. ("If the joinder of offenses or defendants in ... a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.").  And in this regard, settled authority makes clear that severance motions are "committed in the first instance to the sound discretion of the trial court."  *See Person v. Miller*, 854 F.2d 656, 665 (4th Cir. 1988).

Severance is required where the statement of one non-testifying defendant to be admitted at trial directly inculpates a co-defendant.  *See Bruton v. United States*, 391 U.S. 123, 137 (1968). This is so, as *Bruton* and its progeny make clear, because admitting such a statement violates the co-defendant's Sixth Amendment right to confront and cross examine the non-testifying declarant.  Nor can this constitutional infringement be cured by a limiting instruction that the statement should not be used to determine the guilt or innocence of the co-defendant.[7]  While

---

[7] *Bruton*, 391 U.S. at 137 ("Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's

*Bruton* made clear that "facially incriminatory" statements must be excluded, it left open whether and what kind of redactions of a statement might avoid a Sixth Amendment violation.  Thus, the Supreme Court revisited *Bruton* on two later occasions to determine the scope of the rule announced in that case with regard to redactions.  In *Richardson v. Marsh*, 481 U.S. 200 (1987), the Supreme Court held that the admission of a defendant's confession, accompanied by a limiting instruction, does not violate a co-defendant's confrontation right if "the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211.  And this is so even when other evidence properly admitted at trial otherwise links the co-defendant to the statement.  *See id.* at 208-211.  In other words, under *Richardson*, a defendant's statement redacted to eliminate the co-defendant's name and any reference to his or her existence does not run afoul of *Bruton* even if there is other evidence in the case linking the co-defendant to the statement.[8]

Notably, *Richardson* raised, but did not resolve, another question left open in *Bruton*,

---

constitutional right of cross-examination."); *Richardson v. Marsh*, 481 U.S. 200, 212 n.1 (1987) ("The limiting instruction ... is a 'recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's... .'"); *Gray v. Maryland*, 523 U.S. 185, 188 (1998) (holding that a limiting instruction alone is not sufficient to safeguard non-confessing defendant's right of confrontation").

[8]  It is important to note that for *Bruton* purposes the Supreme Court in *Richardson* drew a distinction between (i) statements that are directly inculpatory and (ii) statements that have "inculpatory value" simply because the government has offered other evidence linking the co-defendant to the confession.  *See Richardson*, 481 U.S. at 205-06.  In *Richardson*, the confession at issue was redacted to omit all references to the co-defendant and indeed all references to any other individual participating in the crime.  *See id.* at 203.  Nonetheless, the co-defendant's own testimony provided sufficient evidence for the jury to link her to the confession and the prosecutor in fact linked the co-defendant to the confession during closing argument.  *Id.* at 205-06.  Yet, significantly, the Supreme Court declined to extend *Bruton* "to confessions incriminating by connection."  *Id.* at 209.

namely whether a statement redacted such that the co-defendant's name is replaced with a neutral

pronoun, such as "person," "individual," or "associate," may be admitted under *Bruton*.  *See*

*Richardson*, 481 U.S. at 208-09; *Bruton*, 391 U.S. at 134 n.10.  One aspect of this question was

addressed in *Gray v. Maryland*.  There, the Supreme Court concluded that it is not enough to

replace the co-defendant's name "with an obvious blank, the word 'delete,' a symbol, or similarly

notify the jury that a name has been deleted," such that it is nonetheless "facially incriminatory"

and "directly accusatory"; such a redacted statement still falls within the *Bruton* rule and is

inadmissible.  *Id.* at 193-95.  *Gray* did not, however, address whether redactions that replace the

co-defendant's name with a neutral pronoun, instead of a deletion or blank space, might, in some

circumstances, be constitutionally permissible where other independent evidence might permit

the jury to conclude that the co-defendant is the person referenced in the redacted statement.

    While the circuits are split[9] on this question, current Fourth Circuit authority interpreting

---

[9] The circuits are divided over what evidence a court should consider when determining
whether a redacted statement using a neutral pronoun violates a non-confessing defendant's Sixth
Amendment right to confrontation.  Eight circuits limit the scope of a court's inquiry to the
redacted statement itself: These circuits hold that as long as the redacted statement is not facially
incriminatory with respect to the non-confessing co-defendant, the statement may be admitted,
even if other evidence adduced at trial would allow the jury to conclude that the co-defendant is
the unnamed person referenced in the redaction.  By contrast, three circuits have held that a
redacted statement using a neutral pronoun is admissible only if it does not clearly implicate the
non-confessing co-defendant in light of all of the evidence presented at trial.  *Compare Spears v.
Mullin*, 343 F.3d 1215, 1232 (10th Cir. 2003) ("[T]his court has held that neutral pronouns are
proper, if a defendant's incrimination is by reference to evidence other than the modified
statement and the jury receives a proper limiting instruction."); *U.S. v. Vega Molina*, 407 F.3d
511, 520 (1st Cir. 2005) (holding that a court's inquiry is limited to whether the confession,
standing alone, implicates the non-confessing defendant)*; United States v. Jimenez*, 77 F.3d 95,
98 (5th Cir. 1996) (same); *United States v. Williams*, 936 F.2d 698, 700-01 (2d Cir. 1991)
(same); *U.S. v. Sherlin*, 67 F.3d 1208, 1216 (6th Cir. 1995) (same); *United States v. Brooks*, 125
F.3d 484, 501 (7th Cir. 1997) (same); *United States v. Enriquez-Estrada*, 999 F.2d 1355, 1359
(9th Cir. 1993), *rev'd in part on other grounds* by *United States v. Peterson*, 140 F.3d 819, 822
(9th Cir. 1998) (same); *United States v. Vogt*, 910 F.2d 1184, 1191-92 (4th Cir. 1990) (admitting

*Bruton*, *Richardson*, and *Gray* teaches that a defendant's statements are admissible if the co-defendant's name is redacted and replaced with a neutral pronoun or phrase such as "person" or "individual," or even "friend," "partner," "associate," or "client," provided there is reasonable assurance that use of such a neutral phrase does not result in a statement that is "directly accusatory" or "facially incriminatory" in the same manner as an unredacted or unrevised statement.[10] Thus, the Fourth Circuit, like the majority of circuits, has explicitly extended the *Bruton* line of cases to permit admission of redacted statements that replace a co-defendant's name with "a symbol or neutral pronoun" such that the statement is not facially incriminatory, "even though the statement's application to [the co-defendant] is linked up by other evidence properly admitted against the defendant."[11] To be sure, it is also clear that there may be

_____

redacted statement although the "incriminating import [of the redaction] was certainly inferable from other evidence that earlier had been admitted properly against him"); *with United States v. Vasquez*, 874 F.2d 1515, 1518 (11th Cir. 1989) (noting that courts should look at "the record as a whole" to determine whether the redacted statement violated the complaining defendant's Sixth Amendment rights); *United States v. Washington*, 952 F.2d 1402, 1406-07 (D.C. Cir. 1991) (same); *United States v. Donahue*, 948 F.2d 438, 443-44 (8th Cir. 1991) (considering witness' trial testimony when determining admissibility of redacted statement).

   [10]   See *United States v. Akinkoye*, 185 F.3d 192, 198 (4th Cir. 1999) ("Given the neutral phrases used in the statements ["another person," "another individual," or "a guy in New York"] the defendants were not prejudiced in any way."); *United States v. Vogt*, 910 F.2d 1184, 1191-92 (4th Cir. 1990) (finding that *Bruton* does not bar admission of a redacted statement that replaces defendant's name with a symbol or neutral pronoun, such as "client"); *see also United States v. Smith*, 43 Fed.Appx. 529, 533, 2002 WL 482561 (4th Cir. 2002) (unpublished opinion) (stating that substituting a co-defendant's name with "friend" does not violate *Bruton*); *United States v. Holmes*, 30 Fed.Appx. 302, 307-08 (4th Cir. 2002) (unpublished opinion) (finding that testimony regarding defendant's statement which referred to a co-defendant as "partner" did not violate *Bruton*); *United States v. Smith*, 1999 WL 25560, at *2, 172 F.3d 865 (4th Cir. 1999) (unpublished opinion) (finding that "the prosecution's use of 'associate' or 'associates' [to replace references to specific individuals] does not violate the rule in *Bruton*").

   [11]   *United States v. Vogt*, 910 F.2d 1184, 1191-92 (4th Cir. 1990) (admitting redacted statement although the "incriminating import [of the redaction] was certainly inferable from

circumstances where no redaction can serve to obviate the Sixth Amendment violation; in these circumstances, the reference to the co-defendant's name as well as his existence must be redacted.  In yet other circumstances, no redaction or neutral pronoun substitution will suffice to eliminate a Sixth Amendment violation, in which event the statement must be excluded or a severance ordered.  Thus, the question is whether, given these principles, Alfaro's statements may be adequately and appropriately redacted by using neutral pronouns in lieu of references to Reyes such that they are properly admissible at defendants' joint trial without violating Reyes' Sixth Amendment right of confrontation.

The answer is clear: Both of Alfaro's statements can be appropriately and effectively redacted to eliminate any reference that is facially inculpatory with respect to Reyes.  When Alfaro's June 21 statement is redacted[12] to substitute the neutral pronoun "individual" in place of references to Reyes, it clearly incriminates, at most, only Alfaro.  There is simply nothing in the redacted statement that incriminates the other "individual," let alone indicates that the unnamed individual is Reyes.  Accordingly, Alfaro's June 21 statement, redacted in this way, does not offend Reyes' Sixth Amendment rights.  *See, e.g.*, *United States v. Akinkoye*, 185 F.3d 192, 198 (4th Cir. 1999) ("Given the neutral phrases used in the statements ["another person," "another individual," or "a guy in New York"] the defendants were not prejudiced in any way."); *United States v. Vogt*, 910 F.2d 1184, 1191-92 (4th Cir. 1990) (upholding admission of redacted

_____

other evidence that earlier had been admitted properly against him").  *See also United States v. Holmes*, 30 Fed.Appx. 302, 307-08 (4th Cir. 2002) (holding that the substitution of a neutral pronoun did not violate *Bruton* "even if [the statement] becomes incriminating when linked with other evidence"); *U.S. v. Rivera*, 363 F.Supp.2d 814, 821 (E.D. Va. 2005) (same).

[12] *See supra* note 2 (text of Alfaro's June 21 statement).

statement that replaced defendant's name with the neutral pronoun, "client"); *United States v. Smallwood*, 307 F.Supp.2d 784, 789 (E.D. Va. 2004) (upholding redacted statements that used neutral pronoun instead of defendant's name).

The same result obtains with respect to Alfaro's July 2 statement.  As redacted,[13] that statement is not facially incriminatory with respect to Reyes for at least two reasons.  First, the neutral pronoun "individual" does not in any way suggest that Reyes was the unnamed shooter mentioned in Alfaro's July 2 statement.[14]  To be sure, the government may offer other independent evidence that may lead the jury to conclude that the unnamed "individual" is in fact Reyes, but that does not render the statement inadmissible; the Supreme Court has explicitly stated that this possibility does not render an otherwise properly redacted statement constitutionally inadmissible.  *See Richardson*, 481 U.S. at 208-211; *see also United States v. Vogt*, 910 F.2d 1184, 1191-92 (4th Cir. 1990) (admitting redacted statement although the "incriminating import [of the redaction] was certainly inferable from other evidence that earlier had been admitted properly against him").

Equally important, Alfaro's July 2 statement indicates that the shootings took place after Alfaro visited with Negro and Negro's girlfriend, Melissa.  Thus, the statement that Alfaro "and 'another individual' left Negro's residence when they saw the [victims]" is ambiguous with respect to the identity of the person who left with Alfaro.  Even if a juror assumed that Reyes was

---

[13] *See supra* note 5 (text of Alfaro's July 2 statement).

[14]   In this regard, the government presumably will show that Alfaro and Reyes are members of large gang, MS-13.  It is therefore possible that a reasonable juror might conclude that the references to another "individual" might refer to some a member of MS-13 other than Reyes, even if they assume that the unnamed individual is also a member of MS-13.

the person with Alfaro prior to their arrival at Negro's, there is no reason to believe they would assume that Reyes necessarily was the person who left with Alfaro.  Two other "individuals" who were there other than Reyes–Negro and his girlfriend–are also candidates to be the "individual" who left with Alfaro.[15]  For these reasons, Alfaro's July 2 statement, redacted in this way, does not implicate Reyes "on its face."  *United States v. Locklear*, 24 F.3d 641, 646 (4th Cir. 1994).

Reyes argues that the redactions highlight, rather than obscure, that Reyes is the unnamed "individual," and that no neutral pronoun can remove the incriminatory taint of Alfaro's statement with respect to Reyes.  Accordingly, Reyes argues, the redactions must be altered to eliminate any reference to the existence of another person.  *Gray*, 523 U.S. at 191 ("The Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence").

This argument is unpersuasive.  First, as noted, the redacted statement, fairly construed, does not, on its face, incriminate Reyes.  Moreover, removing any reference to another individual would severely distort the meaning of Alfaro's statements.  In their current form, Alfaro's statements make clear that Alfaro was present at the shootings, but that he was not the shooter.  By eliminating any reference to any other person, the redaction urged by Reyes would necessarily imply that Alfaro alone confronted the victims immediately prior to the shootings.  Put

------

[15] Importantly, the government represented at oral argument that Negro in fact was a member of MS-13.  Assuming the government offers sufficient evidence in this respect, even if a juror assumed (i) that the shooting was gang-related; and (ii) that two MS-13 members were present at the shooting, this redaction makes it equally likely that Negro–not Reyes–was the other person with Alfaro at the shootings.

-12-

differently, Reyes' proffered version of Alfaro's statement would identify Alfaro–not another

"individual"–as the shooter.  It is hard to imagine a redaction less consistent with Alfaro's actual

statements.  Accordingly, Reyes' proposed redaction would impermissibly prejudice Alfaro by

selectively editing Alfaro's statements in a manner that invites the inference that Alfaro was the

shooter.  *See Howard v. Moore*, 131 F.3d 399, 418 (4th Cir. 1997) (upholding district court's

decision to exclude redacted statements because exclusion did not materially alter the meaning of

the confessions);[16] *see also* Rule 106, Fed. R. Evid. ("When a writing or recorded statement or

part thereof is introduced by a party, an adverse party may require the introduction at that time of

any other part or any other writing or recorded statement which ought in fairness to be considered

contemporaneously with it.")

Reyes argues alternatively that, barring severance of defendants' trials, the redactions at

issue must be excluded altogether because they are essentially identical to the redacted statement

invalidated by the Supreme Court in *Gray*.  *See Gray*, 523 U.S. at 193.  Specifically, Reyes

maintains that, within the context of this case, the substitution of *any* neutral pronoun for Reyes'

name to redact the statements in question is no different from inserting a blank space in place of

Reyes' name, because a juror wondering about the identity of the unnamed "individual" "need

only lift his eyes to [Reyes], sitting at counsel table, to find what will seem the obvious answer."

*Id.*  In cases materially identical to this one, however, the Fourth Circuit has rejected this

argument.  *See, e.g.*, *United States v. Smith*, 43 Fed.Appx. 529, 533, 2002 WL 482561 (4th Cir.

---

[16]  *See also U.S. v. Dorrell*, 758 F.2d 427, 434-35 (9th Cir. 1985) (same); *U.S. v. Guzman*, 7 Fed.Appx. 45, 51 (2d Cir. 2001) (unpublished opinion) (noting that the redaction of defendant's statement did not cause him any prejudice because, *inter alia*, the redaction did not change the meaning of his statement).

2002) (unpublished opinion) (stating that substituting a co-defendant's name with "friend" does not violate *Bruton*); *United States v. Holmes*, 30 Fed.Appx. 302, 307-08 (4th Cir. 2002) (unpublished opinion) (finding that testimony regarding defendant's statement which referred to a co-defendant as "partner" did not violate *Bruton*).[17]  Both *Smith* and *Holmes* involved joint trials of two co-defendants where the statement of a confessing co-defendant was redacted using the terms "friend" and "partner," respectively.  Reyes correctly argues that the appropriateness of a redaction cannot be determined in the abstract; whether a redaction sufficiently safeguards a defendant's right to confrontation necessarily depends on the facts of each case.  Reyes, however, points to no material factual difference between the redacted statements upheld in *Smith* and *Holmes* and the redacted statements at issue here.  Accordingly, Alfaro's June 21 and July 2 statements, redacted appropriately and accompanied by a limiting instruction, do not infringe Reyes' Sixth Amendment right to confrontation.

An appropriate Order has issued.

/s/

_____
T. S. Ellis, III
United States District Judge

Alexandria, Virginia
August 29, 2005

---

[17] *See also* cases cited in *supra* note 10.

-14-